Carr, J.
This is a very interesting controversy, as it presents, for the first time, to this court, the case of a blind man’s will offered for probat, and involves the question of the due execution of such a will under our statute. It is much to be wished, that the case had been heard before a full court: but as the judges present are not unanimous, the points will be considered as open, in any case which may hereafter occur.
Our statute enacts, that “ every person aged twenty-one years or upwards, being of sound mind, and not a married woman, shall have power, by last will in writing, to devise his estate &c. so as such will be signed by the testator &lc. and if not wholly written by himself &tc. be attested by two or more credible witnesses subscribing their names in his presence.” The ceremonies required by this law, were not intended to restrain or abridge the power of testators, but to guard and protect them in the exercise of that power; and in that spirit (as I think) should the law be administered. The requisitions of the statute must be satisfied, or the will is not valid; but beyond this, the court seldom looks, unless there be fraud. That will vitiate a will however strict the compliance with the statute; but that must be proved; and, in the absence of proof, the court will not imagine that fraud may possibly have been practised, and act upon that imagination. Such a course would convert the law which was meant as a shield, into a sword, and destroy twenty good and fair wills for one that was fraudulent. Nor ought courts, in their decisions on wills, to be at all influenced by the reflection, that the law has made a just distribution for *51 such as die intestate: that law never meant to interfere with the right of every man to dispose, at his will and pleasure, of the property which it had been the labour of a life to acquire; a right dear to him, and held sacred wherever civilization has made progress, or law bears the semblance of science. Every one admits that a blind man may make a will; he is clearly within the statute; and yet it has provided no particular guards to protect him from imposition. A will signed by him, and attested by two witnesses in his presence, satisfies the statute. What is presence, the statute no where defines; and this is often a question of dispute in ordinary cases. In the case of a blind man, it certainly cannot mean, that the witnesses shall attest in Ms sight. The reason of the statute in requiring that the witnesses shall attest in the presence of the testator, is, not to assure them that he signed the will or knows its contents, but to protect Mm from having a forged will substituted for that he had signed. This danger is not obviated by the fullest proof that a blind man had heard a will read the day before, nor even by reading in the presence of th&jptnesses, for the will may have been changed in the first báse, or read falsely in the last: yet all agree, that the reading the will in the presence of the attesting witnes^eW, in the case of a blind man, is sufficient; and the /¡ase of Longchamp v. Fish decides, that reading in thá;?presenco of the attesting witnesses is not necessary, and,that proof of a prior reading in the presence of the testator is sufficient. In the case of a man who can see, thqi-'signing his will in the presence of witnesses, or acknowledging it to them to be his will, as signed, although lie be illiterate, is proof that he was acquainted with its contents: but, in the case of a blind man, although the forms of the statute be complied with, the jury, or the court of probat, (which, we have said, occupies the place of a jury), will, “ to rebut any imputation of fraud” (as justice Heath expresses it in Longchamp v. Fish) “ require stronger evidence than the mere attestation of signature evidence to satisfy it, that the instrument is really *52 and bona fide his will, which it could not be, unless he knew the contents. But this is no requisition of the statute, nor is the court or jury confined to any particular mode of proof; any evidence which convinces their minds 0p tjle fact) js enough. For this purpose, reading the will over in the presence of witnesses, is agreed to be sufficient; but is this the only proof allowable ? There is no such rule in the common law: and justice Heath, in the case just cited, very sensibly remarks, great inconvenience would arise from any rule, requiring the wills of blirid men to be read over in the presence of attesting witnesses; nor would the mere reading it alone to them, be a certain guard against fraud, since it might be read falsely: and Chambre, J. adds, that testators are generally averse to have their intended dispositions of, property made known in their families before their deaths; and blind men who stand so much in need of attention from their relatives, would, probably, be peculiarly averse to it. If there be no rule on this subject, and we are to be satisfied, as in other cases, by any circumstances and facts, which give us reasonable ground to conclude, that the testator knew the contents of the will; put the case of a blind man, proved to be shrewd, sensible, a punctual, precise man of business, in full possession of his mind; a man who had made his property, and was particularly anxious and careful in the safe and prudent disposition of it among his children; suppose such a man, while in good health, should send for two of his friends, tell them he wished them to attest his will, direct his daughter to bring it out, duly sign, and have it.attesled; and some six years after, this man should, in conversation with an old friend, detail with exactness most of the material provisions in that will, saying at the same time that it was his will: I ask, is there a mind which can resist the conclusion, that this man had dictated such a will to the scribe, and was well acquainted with its contents ? And ought we, when this will is offered for probat, to reject it, because there is no proof that it was read over to the testator, and because, *53 in detailing the contents, there being ten clauses of bequest and devise, he spoke of nine, and did not mention the tenth? The case I have supposed is the case before the court. The will contains, 1. a bequest to his daughter Boyd; 2. to his son James; 3. to his daughter Sarah; 4. to his daughter Ann; 5. to his daughter Apphia; 6. to his son Philip; 7. to his grand daughter Mary Shepperd; 8. the devise to his wife for life; 9. at her death, the land he lived on to be sold, and one fourth of the money put to interest; that interest for the use of his daughter Shepherd, during her life, and at her death, the principal to be divided among her children : the 10th and last devise is, that the western land be sold, and the money, with the three fourths of the sale of the home place, and the residue of his estate, he divided between his two sons and three single daughters. Of these ten clauses, the testator in his conversations with Ford, in 1823, the will being executed in 1817, gave a distinct account of the first nine, but said nothing about the tenth, or if he did, the witness had forgotten it. If he had so forgotten, it would not be remarkable: it is much more remarkable, that he has remembered so much and so accurately as he has. This, indeed, was objected by the counsel, as going strongly to his credit; but, if he needed support, it is amply given him by eight witnesses, some of whom have known him thirty years, and all say he has the highest character for honesty, truth and correctness. We cannot, therefore, refuse him our belief; and giving it, how can we doubt that Vass knew the contents of this will ? But this is not all. Before he made his will, he told Webb, that he never meant to leave his son-in-law Shepperd any of his property, but would have money put out at interest, of which his daughter during her life might have the profits; and for his daughter Boyd, the property was to remain with her and her husband during their lives, and then to return : and the reason he gave for this, was, that she had no children, and would probably have none, and he did not wish his property to go to Boyd’s family. These, we know, are *54 the provisions which he afterwards had inserted in the will. Again,in 1823, hejtold Coolc he had a will; he was not satisfied with it; he intended to get it altered; but, if he did not, it should stand: he told him also several of the pjoyjgioug 0f this will, namely, those with respect to his grand daughter, and his two married daughters; and he gave him his reasons for not giving either of his sons-in-law property; that Boyd had no children, and would have none probably, and that he did not think him capable of managing property; and as to Shepperd, that, if he gave him property, he was such a drunkard, he would soon spend it, or drink it up. His lapguage to Goode also, in 1823, was to the same effect. This evidence proves, beyond a question, to my mind, that the paper offered for probat, contains the deliberate and settled will of the testator in the disposition of his property; more especially, his fixed determination never to give his sons-in-law any of his property ; and they are the only persons resisting the probat.
It was objected in the argument, that, the witness Shea-ran, does not prove that he attested in the presence of the testator; and the case of Burwell v. Corbin was mentioned: but that was a case differing from this. There the court was acting on a special verdict, where every thing must be directly found, and nothing inferred: here, the court of probat acts as a jury, and may draw from the evidence, every inference and conclusion which a jury could. Now there is no doubt on my mind, that the reasonable if not necessary inference from the evidence, is, that both witnesses attested the will at the same time, and both in the presence of the testator. No one can read Shearan’s evidence, without concluding that the whole transaction took place at one time, in one room; and this even without the aid of the other witness, who swears directly, that both signed their attestation in the presence of the testator. Could I, as a juryman, possibly resist this evidence? Certainly not; and holding the same station as part of the court of probat, I find it equally conclusive.
*55 With respect to the evidence rejected, it does not seem to me worth while to consider whether it ought to have been received or not. For if received, it could have been relied on solely as proof of revocation. We know, that no directions given by a testator to another, to destroy his will, amounts to a revocation. The statute provides, that no will “ shall be revocable, but by the testator destroying, cancelling or obliterating the same, or causing it to be done in his presence” ike. Mere parol directions given to a person to destroy the will, could never satisfy these requisitions of the statute; and to suffer them, would bo to incur the very danger the statute meant to avoid. I think the sentence of the circuit court should be affirmed.
Gbeen, J. concurred.
Cabell, «7.
Blind men are embraced by the general words of the statute of wills, giving the power to make a will of lands. A blind man may, therefore, make such a will. But the legislature has deemed it important to guard all persons against the substitution of surreptitious or fabricated wills. With this view, the statute has declared, that no will of lands, if not wholly written by the testator or testatrix, shall be valid, unless it be “ attested by two or more witnesses subscribing their names in his or her presence.” The policy of this provision extends to blind persons, not less than to others. In promoting this policy, the courts have been strict in their construction of the term “presence.” In reference to those who have their eyesight, an attestation, to be in the “ presence,” must be in the same room with the testator, or where he can, if he will, see the witnesses sign their names. Thus, if the witnesses subscribe their names in a different room, but in a part of that room where he cannot see them, without a change of his own position, the paper cannot be established as a will of lands; and the construction would be the same, even if it should appear that the testator was in perfect health, in the *56 full possession of all his faculties, mental and corporeal, and within three feet of the spot where the witnesses subscribed their names; and even although there should be the most positive and credible testimony that every thing was fgjjjiy done.- This is required, in order that the testator may know, that the will which the witnesses attest, is the very will which he himself has signed. The term presence, in the statute, is as applicable to those who are blind, as it is to those who are exempt from that misfortune. But, as we' cannot impart the power of vision to those who are blind, the term presence, when applied to them, must have an interpretation different from that which is given to it, when applied to those who can see. It must not, however, be divested of all its force. It must still be so construed as to promote the policy of the statute; the suppression of surreptitious wills. This will be effected by requiring, in the-case of a blind man, proof that the testator knew the contents of the will which he signed, and which the witnesses attested. I do not say, that it must necessarily appear that the will was read to him. That is one mode of proving that he knew its contents. But any other testimony that satisfies the mind of the same fact, will be sufficient.
The will, in this case, was not written by the testator, who was a blind man, but it was signed by him, and attested by subscribing witnesses. There is certainly no positive proof that it was read to him. What is the proof that he knew its contents ? The most that can be said on this point, is, that it is proved that the testator declared that he had made a will, and that he had made certain dispositions of slaves to his' children and grand children; that what he gave to Mrs. Boyd (one of his daughters) was to return to his .estate at her death; that he had made a comfortable provision for his wife, and that at her death, the land on which he then lived"was to be sold; that one fourth of the money arising from the sale was to be put out at interest, for the benefit of his daughter Mrs. Shepperd during her *57 life, and al her death, to bo divided among her children. And, when we look at the will offered for probat, we find in it certain provisions conforming with, or resembling the above declarations of the testator. But the will contains other provisions of much more importance than those alludod to. It contains the disposition of the remaining three fourths of the money arising from the sale of the land on which ho lived; it directs the sale of his western lands, and the disposition of the money arising therefrom, and also of “ all the remainder” of his estate; and it appoints J. W. Cook executor. As to all these important parts of the will, there is not a tittle of testimony that the testator had any knowledge of them whatever. What assurance have we, that these important dispositions were directed by the testator, or that he wished or intended them to constitute a part of his will? It is not sufficient to say, that no fraud appears to have been committed or intended. That argument would prove too much: it would make good a will signed by a person not blind, if attested by witnesses not in his presence: it would make good the will of a blind man, if signed by him, and attested by witnesses, although there be no proof that he was acquainted with any part of its contents. But this is a degree of confidence to which the law will not permit either of them to surrender himself, however willing he may be to become the victim.
I am not disposed to defeat wills by resorting to technical objections. But I can never assent to establish any paper as the will of a dead man, without proof that it is Ms will; or, in other words, without proof that the paper exhibited contains the dispositions which he intended to make, and none other.—I am therefore of opinion, that the sentence of the circuit court ought to be reversed and that of the county court affirmed; but the majority of the judges approve the sentence of the circuit court, which is therefore to be affirmed.