**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

In Re: UNITED INDUSTRIAL SERVICES,
INCORPORATED,
<u>Debtor.</u>

CERTAIN LONDON MARKET INSURERS,
<u>Plaintiffs-Appellants,</u>                                    No. 95-2481

v.

UNITED INDUSTRIAL SERVICES,
INCORPORATED; WESTINGHOUSE
ELECTRIC CORPORATION,
<u>Defendants-Appellees.</u>

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(CA-95-693-PJM, BK-92-13516)

Argued: March 6, 1996

Decided: April 17, 1996

Before HALL, HAMILTON, and LUTTIG, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**COUNSEL:** Michael Joseph McManus, JACKSON & CAMPBELL,
P.C., Washington, D.C., for Appellant. Richard Osgood Duvall,

HOLLAND & KNIGHT, Washington, D.C., for Appellees. **ON BRIEF:** Richard S. Kuhl, Jonathan R. Clark, JACKSON & CAMPBELL, P.C., Washington, D.C., for Appellant. John Thorpe Richards, Jr., HOLLAND & KNIGHT, Washington, D.C., for Appellee Westinghouse; Robert F. Condon, Washington, D.C., for Appellee United Industrial.

———————————————————————————————

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

———————————————————————————————

**OPINION**

PER CURIAM:

Certain London Market Insurers (the Insurers) brought this declaratory judgment action in United States Bankruptcy Court for the District of Maryland against the debtor, United Industrial Services, Inc. (United), seeking a declaration that two liability insurance policies issued to United excluded coverage for damages resulting from United's spill of hazardous material. The bankruptcy court held that coverage existed under one of the policies, but not under the other policy. Both sides appealed to the district court, which held that coverage existed under both policies. The Insurers now appeal the district court's order. For the reasons stated below, we affirm.

I.

Westinghouse Electric Corporation (Westinghouse) was hired to replace old electrical transformers at the United States Capitol. United was a subcontractor for Westinghouse. The subcontract required United to remove from an underground vault drums containing polychlorinated biphenyls (PCBs), a hazardous substance that had been drained from electrical transformers at the Capitol. On August 3, 1992, while United employees were using a crane to lift a PCB drum, the PCB drum fell from the crane, hit the ground, and ruptured, spilling approximately fifty-five gallons of PCBs. Following the PCB

2

spill, Westinghouse conducted an extensive clean-up operation that included deconstructing and reconstructing part of a concrete tunnel that had become contaminated with PCBs. Westinghouse spent over $1,900,000 on the clean-up operation. On December 28, 1992, Westinghouse filed a suit against United, seeking indemnification from United under the subcontract, and alleging that the PCB spill was caused by United's negligence.

At the time of the PCB spill, United had liability insurance under two policies issued by the Insurers. United had a Primary Policy with a $1,000,000 limit and an Umbrella Policy with a $4,000,000 limit. Both policies gave the Insurers the right to control the defense of any claim within the policies' coverage. The Insurers notified United, by a letter dated January 7, 1993, that a law firm had been retained to represent United in the suit brought by Westinghouse.

On February 4, 1993, the law firm retained by the Insurers to represent United filed an answer on behalf of United. This answer did not request a jury trial. On February 25, 1993, the Insurers notified United that an exclusion contained in both the Primary Policy and the Umbrella Policy might preclude coverage for the PCB spill and that the Insurers were proceeding with United's defense under a complete reservation of rights. On February 26, 1993, the law firm hired by the Insurers to represent United filed an amended answer that included a demand for a jury trial. Because the jury trial demand was untimely, the district court struck it from the answer. The district court then referred the case to a magistrate, who conducted a bench trial and rendered judgment in favor of Westinghouse.

While the suit between Westinghouse and United was pending, the Insurers brought this action against United, seeking a declaratory judgment that neither the Primary Policy nor the Umbrella Policy covered the PCB spill. The action was filed in the bankruptcy court as an adversary proceeding because United had filed for bankruptcy. Subsequently, Westinghouse was granted permission to intervene on the side of United.

The bankruptcy court held that the Primary Policy provided coverage for the PCB spill, but that the Umbrella Policy did not. Both sides appealed to the district court. The district court affirmed the bank-

3

ruptcy court's determination that the Primary Policy provided coverage for the PCB spill and additionally held that the Insurers were estopped from denying coverage for the PCB spill under both the Primary Policy and the Umbrella Policy. On appeal to this court, the Insurers argue that the PCB spill was not covered under the Primary Policy and that they should not be estopped from denying coverage under either policy.

## II.

Because the district court sits as an appellate court in bankruptcy cases, our review of the district court's decision is plenary. Brown v. Pennsylvania State Employees Credit Union, 851 F.2d 81, 84 (3d Cir. 1988). We apply the same standard of review as the district court applied to the bankruptcy court's decision. Findings of fact are reviewed for clear error and conclusions of law are reviewed de novo. In re Johnson, 960 F.2d 396, 399 (4th Cir. 1992).

## III.

We first consider the Insurers' argument that the Primary Policy does not provide coverage for the PCB spill. We begin by reviewing two provisions of the Primary Policy.

The Primary Policy contains an endorsement, referred to as "Endorsement No. 1," which provides:

> It is understood and agreed that Bodily Injury or Property Damage arising out of loading and unloading of property by means of mechanical devices, not attached to an automobile, is hereby covered under this policy.

(J.A. 301). The Primary Policy also contains several exclusions from coverage. Among these exclusions is the "Paramount Exclusion," which provides:

> Notwithstanding anything to the contrary contained in this policy, it is hereby agreed that this policy shall not apply to any liability arising out of:

4

. . .

> seepage, pollution or contamination or any such similar lia-
> bility in connection with any operation provided by, for or
> on behalf of the Assured or any contract with the Insured,
> for the sale, removal, disposal or dumping of any hazardous
> waste materials.

(J.A. 299).

The parties agree that Texas law governs the interpretation of the policies. Under Texas law, courts must interpret the meaning of the language actually used in an insurance policy and give effect to the intention of the parties as expressed in the writing. State Farm Lloyds, Inc. v. Williams, 791 S.W.2d 542, 545 (Tex. Ct. App. 1990). If the language is plain, it must be enforced as written. Id. Insurance policies should be construed so as to give effect to all parts of the policy. See Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132, 133 (Tex. 1994); see 13A John A. Appleman & Jean Appleman, Insurance Law and Practice § 7537 (1976) ("Provisions of the policy and an endorsement thereon are to be read together, and they should be construed, if possible, so as to give effect to all provisions."). The parties agree that when an insurance policy contains an endorsement that conflicts with another provision in the insurance policy, the endorsement controls. See United States Fire Ins. Co. v. Aetna Casualty & Sur. Co., 781 S.W.2d 394, 399 (Tex. Ct. App. 1989).

The bankruptcy court and the district court concluded that Endorsement No. 1 conflicted with the Paramount Exclusion. Applying the rule that an endorsement controls over conflicting policy provisions, the courts held that the Primary Policy provided coverage for the PCB spill under Endorsement No. 1, even though the Paramount Exclusion precluded coverage for damages arising from the removal of hazardous wastes. Thus, the courts effectively read the Paramount Exclusion out of the Primary Policy.

Because it is possible to give meaningful effect to Endorsement No. 1 without reading the Paramount Exclusion out of the Primary Policy, we reject the interpretation given the Primary Policy by the bankruptcy court and the district court. See Forbau, 876 S.W.2d at

5

133; see also Western Heritage Ins. Co. v. Magic Years Learning Ctrs. & Child Care, Inc., 45 F.3d 85, 88-90 (5th Cir. 1995) (applying Texas law) (holding that an exclusion in an insurance policy precluded coverage for a claim otherwise covered by a general grant of coverage in an endorsement, because the endorsement and the exclusion could be read together without rendering the endorsement meaningless).

Endorsement No. 1 generally provides coverage for damages "arising out of loading and unloading of property by means of mechanical devices, not attached to an automobile." (J.A. 301). But the Paramount Exclusion modifies this general provision of coverage by stating that "[n]otwithstanding anything to the contrary contained in this policy," coverage is precluded for damages resulting from "pollution . . . in connection with any . . . removal . . . of any hazardous waste materials." (J.A. 299). Thus, under a plain reading of both policy provisions, loading and unloading activities are covered by Endorsement No. 1, except when the loading or unloading results in pollution in connection with removal of any hazardous waste materials. Because the PCB spill occurred in connection with the removal of hazardous waste materials, the Primary Policy excludes coverage for the PCB spill.

IV.

Having concluded that the terms of the Primary Policy excluded coverage for the PCB spill, we now consider whether the Insurers are estopped from denying coverage under the Primary Policy and the Umbrella Policy for the PCB spill, regardless of the terms of the policies.[1]

In Texas, "[i]t is well established that, whereas the doctrines of waiver and estoppel may operate to avoid conditions that would cause a forfeiture of an insurance policy, they will not operate to change, re-write or enlarge the risks covered by the policy." Farmers Texas County Mut. Ins. Co. v. Wilkinson, 601 S.W.2d 520, 521 (Tex. Civ. App. 1980). However, if an insurer assumes an insured's defense

_____

[1] It is undisputed on appeal that the terms of the Umbrella Policy excluded coverage for the PCB spill.

6

without obtaining a reservation of rights, the insurer may be estopped from denying coverage. Id. at 521-22. This coverage by estoppel applies if three elements are established: (1) the insurer had sufficient knowledge of the facts or circumstances indicating noncoverage; (2) in spite of this knowledge, the insurer assumed the defense of the insured without obtaining an effective reservation of rights; and (3) the insured suffered harm as a result of the insurer's assumption of the insured's defense. See Williams, 791 S.W.2d at 552; see also Pennsylvania Nat'l Mut. Casualty Ins. Co. v. Kitty Hawk Airways, Inc., 964 F.2d 478, 481 (5th Cir. 1992) (applying Texas law).

It is undisputed that the first two elements exist here. Although the Insurers had sufficient knowledge of facts indicating noncoverage, they assumed United's defense on January 7, 1993, and they did not obtain an effective reservation of rights until February 25, 1993.

The dispute in this case centers on the third element. United argues that it suffered harm as a result of the Insurers' assumption of its defense because the law firm hired by the Insurers to represent United negligently waived United's right to a jury trial. The Insurers argue, however, that United's loss of its right to a jury trial is not the type of harm required to establish coverage by estoppel. **2**

The bankruptcy court agreed with the Insurers that United's loss of its right to a jury trial did not satisfy the third element. The district court reversed the bankruptcy court on this issue and held that the Insurers were estopped to deny coverage for the PCB spill under both the Primary Policy and the Umbrella Policy. We agree with the district court that United has established the third element of coverage by estoppel.

When an insurer has knowledge of facts indicating noncoverage and nevertheless provides a defense to an insured without obtaining a reservation of rights, there are two potential sources of harm to the

_____

**2** The Insurers also argue that under the law of agency they cannot be held responsible for the law firm's defense of United because the law firm was an independent contractor. This argument is without merit, because the liability at issue here is based on principles of estoppel, rather than principles of agency.

7

insured. First, harm can result from the conflict of interests that exists when a lawyer represents the insured while simultaneously formulating a defense of noncoverage against the insured. See Williams, 791 S.W.2d at 551. Second, harm can result from the insured's relinquishment of control of the defense to the insurer. See id. The doctrine of coverage by estoppel protects an insured from both these sources of harm. See id. at 552. But "unless a conflict of interests or other harm is clear and unmistakable, . . . the insured must show how he was harmed." Id. at 553.

Here, as a result of relinquishing control of its defense to the Insurers, United lost its right to a jury trial. Although, as the Insurers argue, the outcome of the trial may have been the same with a jury, United's loss of its right to a jury trial is harm in itself. Cf. Federal Deposit Ins. Corp. v. Marine Midland Realty Credit Corp., 17 F.3d 715, 721 (4th Cir. 1994) (holding that a trial court's erroneous denial of a jury trial is harmful unless the trial court would have ordered judgment as a matter of law). A representative of United testified that if the law firm had consulted with United regarding whether to seek a jury or nonjury trial, United would have requested a jury trial. Moreover, the law firm retained by the Insurers to represent United in the Westinghouse suit has admitted that the suit was "a jury-type case" involving negligence, and that "[t]he nature of the factual inquiries . . . in th[e] case [were] best suited for a jury." (J.A. 545-46). United thus has shown that it was harmed as a result of relinquishing the control of its defense to the Insurers.

The Insurers argue, however, that the loss of the right to a jury trial is not the type of harm required to establish coverage by estoppel. According to the Insurers, to satisfy the third element of coverage by estoppel, there must be a conflict of interests between the insured and the insurer, so that the insured's claim of coverage was prejudiced by the insurer's assumption of the defense. We can find no support in Texas law for this argument. Although the Williams court recognized that harm can result from the conflict of interests that exists when a lawyer represents the insured while simultaneously formulating a defense of noncoverage against the insured, it also recognized that harm can result from the insured's relinquishment of control of the defense to the insurer. See Williams, 791 S.W.2d at 551. The Williams court made clear that coverage by estoppel is not limited to situations

8

where there is a conflict of interests related to the coverage dispute by stating that "unless a conflict of interests <u>or other harm</u> is clear and unmistakable, . . . the insured must show how he was harmed." <u>Id.</u> at 553 (emphasis added).

The Insurers rely principally on <u>Kitty Hawk</u>. In that case, the Fifth Circuit had to determine whether an insured had established the third element of coverage by estoppel. The court found no evidence that the insured was harmed by a conflict of interests relating to the coverage dispute. 964 F.2d at 482. The court also found no evidence that the insured was harmed by relinquishing control of its defense. <u>Id.</u> at 483. Indeed, the insured had conceded that it did not have any complaints regarding the defense provided by the insurer. <u>Id.</u> The court thus concluded that the insured failed to establish the third element. Summing up, the court stated:

> Accordingly, we hold that, when, as in this case, the facts <u>do not suggest</u> that counsel provided by an insurer to defend its insured has acted to prejudice (or even had an opportunity to prejudice) the insured's claim of policy coverage, no inference of harm to the insured arises.

<u>Id.</u>

The Insurers seize on this sentence as support for the argument that only harm related to the coverage dispute will satisfy the third element of coverage by estoppel. But a reading of this sentence in the context of the entire case shows that the court was merely heeding the admonishment in <u>Williams</u> that "unless a conflict of interests or other harm is clear and unmistakable, . . . the insured must show how he was harmed." 791 S.W.2d at 553. In <u>Kitty Hawk</u>, the insured could not point to any harm resulting from the insurer's control of the defense. United, unlike the insured in <u>Kitty Hawk</u>, has shown that it was harmed by the Insurers' control of its defense. Thus, the facts of <u>Kitty Hawk</u> are distinguishable from this case. Because United has shown that it was harmed as a result of relinquishing the control of its defense to the Insurers, United has established the third element of coverage by estoppel.**3**

_____

**3** Because we conclude that United's loss of the right to a jury trial satisfies the third element of coverage by estoppel, we need not address United's other allegations of harm resulting from the Insurers' control of the defense.

9

V.

In summary, we hold that although the terms of the Primary Policy and the Umbrella Policy excluded coverage for the PCB spill, the Insurers are estopped from denying coverage under either policy, because they assumed the defense of United and waived United's right to a jury trial before obtaining a reservation of rights. Therefore, the order of the district court affirming in part and reversing in part the order of the bankruptcy court is affirmed.

AFFIRMED

10